IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NORTH CAROLINA
SOUTHERN DIVISION
No. 7:09-CV-105-D

| | | |
|---|---|---|
| HEXION SPECIALTY CHEMICALS, INC., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | **ORDER** |
| | ) | |
| OAK-BARK CORPORATION, | ) | |
| | ) | |
| Defendant. | ) | |

On July 1, 2009, Hexion Speciality Chemicals, Inc. ("plaintiff" or "Hexion") sued Oak-Bark

Corporation ("defendant" or "Oak-Bark") alleging breach of warranty concerning a 2006 asset

purchase agreement ("APA") in which Hexion purchased most of the assets and operations of Oak-

Bark's chemical manufacturing plant in Columbus County, North Carolina. Hexion contends that

Oak-Bark breached certain warranties in the APA concerning (1) wastewater treatment; (2) the level

of combustible dust at the plant; and (3) one of the plant's ammonia storage tanks. Hexion seeks

approximately $2.7 million in damages. On September 20, 2010, the parties filed cross-motions for

summary judgment [D.E. 51, 54]. Oak-Bark seeks summary judgment on Hexion's warranty claims

[D.E. 51], and Hexion seeks partial summary judgment as to liability on the warranty claims [D.E.

54]. On October 12, 2010, Hexion and Oak-Bark filed responses [D.E. 63, 64]. On October 22 and

25, 2010, Hexion and Oak-Bark replied [D.E. 69, 72]. As explained below, the court grants Oak-

Bark's motion for summary judgment and denies Hexion's motion for partial summary judgment.

I.

Summary judgment is proper when "the movant shows that there is no genuine dispute as to

any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a);

Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986); Anderson v. Liberty Lobby, Inc., 477 U.S. 242,

247–48 (1986). The moving party bears the initial burden of demonstrating the absence of a genuine issue of material fact. Celotex, 477 U.S. at 325. After the moving party has met this burden, the nonmoving party "must come forward with specific facts showing that there is a genuine issue for trial." Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986) (emphasis and quotation omitted). A genuine dispute about a material fact exists "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Anderson, 477 U.S. at 248. The court views the evidence and the inferences drawn therefrom in the light most favorable to the nonmoving party. Scott v. Harris, 550 U.S. 372, 378 (2007). When considering cross-motions for summary judgment, a court evaluates each motion using the standard set forth above. See, e.g., United States v. Bergbauer, 602 F.3d 569, 574 (4th Cir. 2010); Simmons v. Prudential Ins. Co. of Am., 564 F. Supp. 2d 515, 520 (E.D.N.C. 2008).

Hexion and Oak-Bark are competitors in the chemical manufacturing industry. On November 21, 2006, Hexion agreed to purchase most of the assets and operations at Oak-Bark's chemical manufacturing plant located in Columbus County, North Carolina (hereinafter "plant"). At the plant, Oak-Bark and the preceding owner, Wright Chemical Corporation, produced various chemicals, including formaldehyde, hexamine, and ketone. After the sale, Oak-Bark retained assets and operations on the site, leaving Oak-Bark and Hexion to coexist at the plant. See Pl.'s Mem. Supp. Mot. Summ. J. [D.E. 55], App. D Ex. 4 ("APA") §§ 2.1 & 2.2; Def.'s Mem. Supp. Mot. Summ. J. [D.E. 52] 3. The sale was consummated with a detailed asset purchase agreement, in which Oak-Bark agreed to place $3 million of the purchase money in an escrow account for a period of 3 years. See APA § 11.5. The purpose of the escrow account was to provide indemnification to Hexion for any damages suffered as a result of, inter alia, "any breach of any representation or warranty made by [Oak-Bark] in [the APA] . . . or any other certificate, document, writing or instrument delivered by [Oak-Bark] pursuant to [the APA]." Id. §11.2(a).

2

After the sale, Hexion encountered various problems in the plant. On March 12, 2009, Hexion demanded indemnification pursuant to section 11.2 of the APA. Oak-Bark refused indemnification, and Hexion filed this action on July 1, 2009, alleging breach of warranty. See Compl. [D.E. 1]. On October 2, 2009, this court entered a scheduling order [D.E. 19]. On January 19, 2010, Hexion (with Oak-Barks's consent and this court's approval) filed an amended complaint [D.E. 24]. Hexion's amended complaint describes three specific breaches. See Am. Compl. ¶¶ 10–30; Pl.'s Mem. Supp. Mot. Summ. J. 3.[1]

Hexion's first claim relates to the treatment of the plant's wastewater, which is a byproduct of the plant's chemical manufacturing process. Hexion contends in its amended complaint that:

10.     A publicly owned treatment works wastewater facility ("POTW Wastewater Facility" as defined in the Agreement) supports the operation of the Business.

11.     Oak-Bark was responsible for the design of the POTW Wastewater Facility.

12.     Since acquiring the Business, Hexion has received notices from Columbus County that the POTW Wastewater Facility has had persistent ammonia and biological oxygen demand violations since it began operation. These violations indicate that the POTW Wastewater Facility is under-designed and as a result, sustained operation of the POTW Wastewater Facility at its maximum design capacity will result in failure to comply with the relevant NPDES permits.

13.     Though Hexion has modified its operations to address the violations, Hexion has had to pay over $13,000 in fines related to the POTW Wastewater Facility.

14.     Hexion has also incurred substantial costs associated with engineering modifications to its production processes and for offsite disposal of wastewater necessitated by the faulty design of the POTW Wastewater Facility.

15.     Hexion must also modify the hexamine stripper to resolve the issue with the POTW Wastewater Facility which will require a substantial expenditure.

16.     Oak-Bark has therefore breached the representations and warranties contained in §§ 3.17(a), 3.22(a), 3.22(c), 3.22(i), and 3.22(k) of the Agreement.

Am. Compl. ¶¶ 10–16. Hexion seeks $1.5 million in damages. See id. ¶ 17.

---

[1] Hexion alleged four breaches in its complaint and amended complaint. See Compl. ¶¶ 31–36; Am. Compl. ¶¶ 31–36. However, Hexion has abandoned its claim related to the lined pond. See Pl.'s Mem. Supp. Mot. Summ. J. 3.

3

Second, Hexion seeks damages caused by alleged warranty breaches relating to combustible dust, a byproduct of producing hexamine at the plant. See id. ¶¶ 18–22. The parties agree that producing hexamine leads to dust that can become explosive when suspended in the air at a high enough concentration. Hexion claims that Oak-Bark breached two specific warranty provisions concerning combustible dust, both of which caused Hexion to spend $448,493 in repairing the plant to reduce the combustible dust risk. Id. ¶ 22.

Initially, Hexion cites APA section 3.22(g). Id. ¶ 19. In section 3.22(g), Oak-Bark affirmed that it had "delivered to Buyer true and complete copies and results of any reports, studies, analyses, tests, or monitoring possessed or initiated by Seller or on behalf of Seller pertaining to Hazardous Materials or Hazardous Activities, in, on, or under the Facilities . . . ." APA § 3.22(g). Hexion claims that Oak-Bark failed to provide a copy of a January 5, 2000 report that the Fike Corporation (hereinafter "the 2000 Fike Report") completed for Oak-Bark's predecessor Wright Chemical Corporation. Wright Chemical Corporation obtained the 2000 Fike Report in conjunction with purchasing Blue Tech, Inc. equipment from WW Sly Manufacturing Company to be used at the plant. See Def.'s Mem. Opp'n Mot. Summ. J. [D.E. 64], Ex. 30 ("2000 Fike Report"). The 2000 Fike Report states that hexamine production creates a dust explosion hazard. See id. Hexion claims that Oak-Bark's failure to tender the 2000 Fike Report in 2006 violated section 3.22(g). See Am. Compl. ¶ 21.

Hexion also argues that the level of combustible dust that it encountered when it began operating the plant in November 2006 "violated the general duty clause of the Occupational Safety and Health Act, 29 U.S.C. § 654, and requirements regarding general safety and maintenance of a clean workplace, 29 C.F.R. §1910.22(a)(1)." Id. ¶ 20. Hexion alleges that Oak-Bark's conduct violated APA sections 3.17(a), 3.22(a), 3.22(c), 3.22(g), and 3.22(i). See id. ¶ 21. Hexion claims that it "has incurred substantial expenditures, amounting to approximately $448,493, in order to address the explosion hazard associated with the hexamine operations and to bring the Facility into

4

compliance with applicable legal requirements." Id. ¶ 22.

Finally, Hexion alleges that "one of the ammonia storage tanks on the Facility lacked mechanical integrity" on the closing date. Id. ¶ 23. The amended complaint then states:

24.     As a result of this condition, Hexion had to inspect, test and repair the ammonia storage tank.

25.     Hexion also had to obtain a variance to otherwise applicable legal requirements, which variance authorized Hexion to continue to use the tank while it evaluated and pursued repairs.

26.     Due to the inherently dangerous nature of the ammonia stored in the tank, the presence of the tank in mechanically deficient condition amounts to a Hazardous Activity.

27.     The lack of mechanical integrity associated with the tank is also a violation of Occupational Safety and Health Administration regulations related to process safety management of highly hazardous chemicals, 29 C.F.R. 1910.119.

28.     By conveying a mechanically deficient ammonia storage tank to Hexion, Oak-Bark has breached the representations and warranties continued in §§ 3.10(a), 3.10(b), 3.17(a), 3.22(a), 3.22(c), and 3.22(i) of the Agreement.

29.     Hexion has incurred costs, amounting to approximately $60,000, associated with necessary mechanical integrity testing, to effect temporary repairs, and to secure a variance to allow operation of the ammonia storage tank though March 31, 2010.

30.     Hexion will also have to replace the ammonia storage tank at a cost of in excess of approximately $700,000.

Id. ¶¶ 24–30.

Oak-Bark seeks summary judgment on Hexion's breach of warranty claims in the amended complaint, and Hexion seeks summary judgment as to liability on the breach of warranty claims. Oak-Bark also seeks summary judgment based on Hexion's delay in giving Oak-Bark notice of its claims. See Def.'s Mem. Supp. Mot. Summ. J. 14–23. Oak-Bark claims that Hexion's failure to give timely notice breached its duties under the APA, thereby excusing Oak-Bark from further performance of all duties, including indemnifying Hexion. Id. In support, Oak-Bark cites APA

sections 11.3(b)[2], (e)[3], and (f)[4]. See id. Additionally, Oak-Bark seeks summary judgment based on equitable estoppel and laches. See id. at 19–23. Finally, Oak-Bark seeks summary judgment and contends that Hexion breached the implied covenant of good faith and fair dealing. See id. at 23.

---

[2] Section 11.3(b) states:

Except for Remedial Actions or Proceedings relating to Environmental, Health and Safety Liabilities, being conducted by Seller on or before the Closing Date, which Seller shall continue at its sole cost to completion, Buyer shall have the sole and exclusive right to conduct and retain exclusive control over any Remedial Action, any Proceeding relating to Environmental, Health and Safety Liabilities and, except as provided in the following sentence, any other Proceeding with respect to which indemnity may be sought under this Section 11.3. Seller and Buyer shall keep one another reasonably informed of any Remedial Actions or proceedings they are conducting. The procedure described in Section 11.6 will apply to any claim solely for alleged monetary damages relating to a matter covered by this Section 11.3. Seller and Buyer shall use reasonable efforts to cooperate and share information relating to any such Remedial Actions or Proceedings.

APA § 11.3(b).

[3] Section 11.3(e) states:

Each party shall promptly notify the other party of any condition which may be subject to indemnity pursuant to this Section 11.3 upon receipt of any written document concerning such matter.

Id. § 11.3(e).

[4] Section 11.3(f) states:

Seller and Buyer agree to cooperate in connection with any Environmental, Health and Safety Liabilities subject to indemnification under this Section 11.3. Upon request, Buyer shall provide Seller with (i) any material correspondence, report, technical data or any other material information generated as a result of a Remedial Action by Buyer and (ii) the right to take split samples, at Seller's sole expense, in each case for the purpose of verifying the performance of any Remedial Action, correction of noncompliance or other action, the costs for which Seller is required to indemnify Buyer pursuant to Section 11.3. Seller and Buyer agree that any information shared or provided to the other party pursuant to this Section 11.3 shall constitute Confidential Information.

Id. § 11.3(f).

6

II.

When federal jurisdiction is based on diversity, a court must apply the choice-of-law rules of the state in which it sits. See, e.g., Klaxon Co. v. Stentor Elec. Mfg. Co., 313 U.S. 487, 496–97 (1941); Am. Online, Inc. v. St. Paul Mercury Ins. Co., 347 F.3d 89, 92 (4th Cir. 2003). Under North Carolina's choice-of-law rules, "a contract is governed by the law of the place where the contract was made." Tanglewood Land Co. v. Byrd, 299 N.C. 260, 262, 261 S.E.2d 655, 656 (1980). Here, the parties entered the APA in North Carolina and agreed that it was to be construed under North Carolina law. See APA § 13.13. Therefore, North Carolina law controls, and this court must determine how the Supreme Court of North Carolina would rule on the substantive claims. See, e.g., Twin City Fire Ins. Co. v. Ben Arnold-Sunbelt Beverage Co., 433 F.3d 365, 369 (4th Cir. 2005).

Although North Carolina substantive law controls, this court must apply applicable federal procedural rules. See, e.g., Guaranty Trust of New York v. York, 326 U.S. 99, 109 (1945). A rule is one of procedure when it "concerns merely the manner and the means by which a right to recover, as recognized by the state, is enforced . . . ." Id. For example, this court must apply the Federal Rules of Civil Procedure, so long as they regulate matters "rationally capable of classification as procedure." Shady Grove Orthopedic Assocs., P.A. v. Allstate Ins. Co., 130 S. Ct. 1431, 1442–43 (2010) (quotation omitted); Hanna v. Plummer, 380 U.S. 460, 472–73 (1965).

Under North Carolina law, to recover for a breach of a contractual warranty, a party must show: (1) the existence of the warranty; (2) the fact of the breach; and (3) "that the breach was the proximate cause of the loss sustained." Rose v. Epley Motor Sales, 288 N.C. 53, 60, 215 S.E.2d 573, 577 (1975); City of Charlotte v. Skidmore, Owings and Merrill, 103 N.C. App. 667, 679, 407 S.E.2d 571, 579 (1991) (holding that "proof of causation is essential" in a breach of warranty action). Moreover, under North Carolina law, interpretation of a written and unambiguous contract is a question of law for the court. Briggs v. Am. & Efird Mills, Inc., 251 N.C. 642, 644, 111 S.E.2d 841, 843 (1960). When construing contractual terms, the contract's plain language controls. See, e.g.,

7

State v. Phillip Morris USA, Inc., 363 N.C. 623, 631–32, 685 S.E.2d 85, 90–91 (2009); Hodgin v. Brighton, 196 N.C. App. 126, 128–29, 674 S.E.2d 444, 446 (2009); Hemric v. Groce, 169 N.C. App. 69, 76, 609 S.E.2d 276, 282 (2005); Martin v. Martin, 26 N.C. App. 506, 508, 216 S.E.2d 456, 457–58 (1975).

A.

In Hexion's amended complaint, its wastewater-treatment claim focuses on the operation of Columbus County's POTW. See Am. Compl. ¶¶ 10–17. In order to put Hexion's wastewater-treatment claim in context, the court recites the following undisputed facts. From 1959 until November 30, 2004, Wright Chemical Corporation owned and operated the plant. Def.'s Mem. Supp. Mot. Summ. J. 3. On November 30, 2004, Wright Chemical Corporation sold the plant to Oak-Bark. Id. On November 21, 2006, pursuant to the APA, Oak-Bark sold certain assets at the plant to Hexion. APA, p.1, Recital A. Certain assets were "Assets to be Sold" and certain assets were "Excluded Assets." See id. §§ 2.1 ("Assets to be Sold"), 2.2 ("Excluded Assets"). Under the APA, Hexion acquired Oak-Bark's "production and manufactur[ing] of formaldehyde, hexamine, ketone, and special projects." Id., p.1, Recital.

As part of the manufacturing process, the plant uses and generates water, and permits are required to operate the plant. At closing, Oak-Bark possessed North Carolina Department of Environment and Natural Resources ("DENR") Division of Air Quality ("DAQ") Permit No. 01394T37, for operating the plant. Def.'s Mem. Supp. Mot. Summ. J. 5; see Pl.'s Reply [D.E. 69], Ex. 13 ("DAQ Permit"). Oak-Bark also possessed DENR Division of Water Quality ("DWQ") Permit No. 3395 for operating the plant's water pretreatment system known as Biotrol and for discharging the pretreated water into Outfall Point #1 of Livingston Creek. See Def.'s Mem. Supp. Mot. Summ. J. 5; Pl.'s Mem. Supp. Mot. Summ. J. 6–7. In addition, Industrial User Pretreatment Permit ("IUP") No. 001 permitted Oak-Bark to use Columbus County's POTW. See Def.'s Mem. Supp. Mot. Summ. J. 5. Finally, Oak-Bark possessed the North Carolina Department of Labor

Certificates of Inspection for its ammonia storage tanks. See id.

Before closing, the DAQ, the DWQ, and Columbus County regulated Oak-Bark's water handling and disposal. See APA Schedule 3.17(b). Oak-Bark used most of its water in other on-site applications in order to reduce the quantities requiring disposal. See Def.'s Mem. Supp. Mot. Summ. J., Ex. 36 ("Def.'s Ex. 36, Busvone Tr.") 35–36, 39, 60–62. Oak-Bark used approximately 75% of its water to produce formaldehyde, ammoniated fertilizer, and steam for its formaldehyde boilers. Id. at 60–62. Oak-Bark sent the remaining water to its Biotrol unit for processing and ultimate discharge into the creek. Id.

NPDES Permit No. 3395 authorized Oak-Bark to treat water in the Biotrol unit before discharging it into the creek. See Def.'s Mem. Supp. Mot. Summ. J., Ex. 35 ("Def.'s Ex. 35, Wilkinson Tr.") 27, 29; id., Ex. 14 ("Def.'s Ex. 14, Oakley Tr.") 50–61, 102–10. As for the POTW, in 1999, Columbus County began studying whether to build a POTW to treat wastewater in Columbus County. See Def.'s Ex. 35, Wilkinson Tr. 10–11; Def.'s Mem. Supp. Mot. Summ. J., Ex. 23 ("Def.'s Ex. 23, Swart Tr.") 30–31. The County, Oak-Bark, and Wright Chemical Corporation participated in discussions concerning the viability of a POTW. See Def.'s Ex. 35, Wilkinson Tr. 10–11. Ultimately, Columbus County decided to construct, own, and operate a POTW in Columbus County at an approximate cost of $2.5 to $3 million. See Def.'s Ex. 14, Oakley Tr. 88–89. Oak-Bark contributed approximately $800,000 to the project and also donated 2.3 acres of land. Id. at 88. In approximately July 2006, Columbus County began the POTW start-up procedures and operations. See Def.'s Ex. 14, Oakley Tr. 95; Def.'s Ex. 36, Busovne Tr. 36–37. During the POTW's start-up period, the POTW had some mechanical issues, but Oak-Bark continued to operate the plant and to discharge wastewater pursuant to NPDES Permit No. 3395 and other related permits. See Def.'s Ex. 14, Oakley Tr. 105–08.

During the POTW's start-up period, Oak-Bark obtained IUP No. 001 from Columbus County. See Pl.'s Mem. Supp. Mot. Summ. J. 8. The IUP, when coupled with Columbus County

9

NPDES Permit No. 87947, permitted Oak-Bark to send its water, within certain parameters, to the POTW for treatment and discharge into the creek. See Def.'s Ex. 14, Oakley Tr. 50–61, 102–10; Def.'s Ex. 35, Wilkinson Tr. 27, 29; Def.'s Ex. 36, Busovne Tr. 30–31. At closing, Oak-Bark was continuing to process its wastewater through its Biotrol unit. See Def.'s Ex. 14, Oakley Tr. 106–10. NPDES Permit No. 3395 applied to Oak-Bark's Biotrol unit and the routing of water through the Biotrol process for treatment and then discharge into the creek. See Def.'s Ex. 35, Wilkinson Tr. 27. NPDES Permit No. 3395 did not apply to the POTW. Id.

In its amended complaint, Hexion references the "'POTW Wastewater Facility' as defined in the [APA] . . . ." Am. Compl. ¶ 10. Hexion contends that, after closing, it discovered that the "POTW Wastewater Facility is under-designed and as a result, sustained operation of the POTW Wastewater Facility at its maximum design capacity will result in a failure to comply with relevant NPDES permits." Id. ¶ 12. As such, Hexion contends that Oak-Bark breached the representations and warranties contained in §§ 3.17(a)[5], 3.22(a)[6], 3.22(c)[7], 3.22(i)[8], and 3.22(k)[9] of

_____

[5] APA section 3.17(a) provides:

Compliance with Legal Requirements; Governmental Authorizations
(a) Except as set forth in Schedule 3.17(a):

(i) Seller is, and at all times since November 30, 2004, and has been, in full compliance with each Legal Requirement that is or was applicable to it or to the conduct or operation of its Business or the ownership or use of any of its Assets;

(ii) no event has occurred or circumstance exists that (with or without notice or lapse of time) (A) may constitute or result in a violation by Seller of, or a failure on the part of Seller to comply with, any Legal Requirement or (B) may give rise to any obligation on the part of Seller to undertake, or to bear all or any portion of the cost of, any remedial action of any nature;

(iii) Seller has not received, at any time since November 30, 2004, any notice or other communication (whether oral or written) from any Governmental Body or any other Person regarding (A) any actual, alleged, possible or potential violation of, or failure to comply with, any Legal Requirement or (B) any actual, alleged, possible or potential obligation on the part of Seller to undertake, or to bear all or any portion of the cost of, any remedial action of any nature;

10

(iv) the products manufactured by Seller and all chemical substances which are contained in such finished products which are required to be on the Inventory List promulgated under the United States Toxic Substances Control Act, were and are on such Inventory List, or are the subject of a Premanufacturing Notice filed with the Environmental Protection Agency under such Act, and Seller has not filed, and to Seller's knowledge has not been under a duty to file, any reports required by Section 8(e) of such Act with respect to substantial risks involving such products. To Seller's Knowledge, none of the products of the Business are subject to an order under Section 5(e), a testing rule under Section 4 or regulation under Section 6(a) of such Act; and

(v) Seller is in compliance in all material respects with any applicable Occupational Safety and Health Law. Since November 30, 2004, Seller has not received or been threatened with any Order, citation, written notice or other formal communication from any Governmental Body or any other Person of any actual or potential violation or failure to comply in all material respects with any Occupational Safety and Health Law. There are no pending or, to Seller's Knowledge, threatened claims, Encumbrances or other restrictions of any nature for any Occupational Safety and Health Liabilities.

APA § 3.17(a).

⁶ APA section 3.22(a) provides:

Seller is, and at all times has been, in full compliance with, and has not been and is not in violation of or liable under, any Environmental Law. Seller does not have any basis to expect to receive and it and any other Person for whose conduct it is or may be held to be responsible has not received, any actual or threatened order, notice or other communication from (i) any Governmental Body or private citizen acting in the public interest or (ii) the current or prior owner or operator of any Facilities, of any actual or potential violation or failure to comply with any Environmental Law, or of any actual or threatened obligation to undertake or bear the cost of any Environmental, Health and Safety Liabilities with respect to any Facility or other property or assets (whether real, personal or mixed) in which Seller has or had an interest, or with respect to any Facility at or to which Hazardous Materials were generated, manufactured, refined, transferred, imported, used or processed by Seller or any other Person for whose conduct it is or may be held responsible, or from which Hazardous Materials have been transported, treated, stored, handled, transferred, disposed, recycled or received.

Id. § 3.22(a).

⁷ APA section 3.22(c) provides:

11

the APA. Id. ¶ 16.

In opposing Hexion's motion for summary judgment and seeking summary judgment, Oak-Bark argues that nothing in the APA contains a representation or warranty from Oak-Bark to Hexion concerning the POTW Wastewater Facility. Thus, Oak-Bark argues that it is entitled to summary judgment.

---

Seller does not have any Knowledge of or any basis to expect, that it or any other Person for whose conduct it is or may be held responsible, received, any citation, directive, inquiry, notice, Order, summons, warning or other such communication that relates to Hazardous Activity, Hazardous Materials, or any alleged, actual, or potential violation or failure to comply with any Environmental Law, or of any alleged, actual, or potential obligation to undertake or bear the cost of any Environmental, Health and Safety Liabilities with respect to any Facility or any other property or asset (whether real, personal or mixed) in which Seller has or had an interest, or with respect to any property or facility to which Hazardous Materials generated, manufactured, refined, transferred, imported, used or processed by Seller or any other Person for whose conduct it is or may be held responsible, have been transported, treated, stored, handled, transferred, disposed, recycled or received.

Id. § 3.22(c).

⁸ APA section 3.22(i) provides:

Seller is in compliance with all permits required under Enviromnental Law in order to conduct the Business ("Environmental Permits"), and each of the Environmental Permits relating to the Business as currently conducted may be validly transferred to Buyer without any alteration or amendments or any notice to or consent of any third person.

Id. § 3.22(i).

⁹ APA section 3.22(k) provides:

Sustained production operations of the Facilities at their maximum design capacity will not constitute or result in any violation or failure to comply with any term, condition, or requirement, including final effluent limits, of North Carolina National Pollution Discharge Elimination System (NPDES) Permit No. NC000395, or any renewal of that permit currently being prepared by the North Carolina Division of Water Quality.

Id. § 3.22(k).

12

The court has reviewed the APA. The APA refers to the POTW Wastewater Facility in the

Definition and Usage Section 1, on page 9, which then cross-references section 2.2(k). See APA §

1, p. 9. The Definition and Usage section states: "POTW Wastewater Facility has the meaning set

forth in section 2.2(k)." Id. In turn, APA section 2.2(k) states:

> any tax credits or refunds in the amount of $400,000.00 related to the initial
> investment in the aggregate amount of $784,391.00 made by [Oak-Bark] in
> connection with the construction of the publicly owned treatment works wastewater
> facility located in Columbus County, North Carolina . . . . (the "POTW Wastewater
> Facility").

APA § 2.2(k). The APA also references the POTW Wastewater Facility in section 7.16, which

relates to Oak-Bark's payments of any pre-closing fines related to the POTW.[10] The APA does not

otherwise mention the "POTW Wastewater Facility." Accordingly, the court agrees that Oak-Bark

did not make a representation or warranty in APA sections 3.17(a), 3.22(a), 3.22(c), 3.22(i), or

3.22(k) concerning the POTW Wastewater Facility. As such, Oak-Bark did not breach any such

representation or warranty.

In opposition to this conclusion, Hexion makes two arguments. First, Hexion argues that

the alleged defects in the POTW Wastewater Facility violate APA section 3.22(k). APA section

3.22(k) states:

> Sustained production operations of the Facilities at their maximum design capacity
> will not constitute or result in any violation or failure to comply with any term,
> condition, or requirement, including final effluent limits, of North Carolina National
> Pollution Discharge Elimination System (NPDES) Permit No. NC000395, or any

---

[10] APA section 7.16 provides:

> Buyer shall have received evidence that fines in the aggregate approximate amount
> of $25,000 which have been imposed on Seller for failure to connect to a POTW by
> July 1, 2006 as required by North Carolina Environmental Management Commission
> Special Order By Consent EMC WQ No. 05-003 have been paid in full, or
> alternatively a sworn statement of Seller affirming Seller is in full compliance with
> the Special Order By Consent and no fines have been or will be imposed under the
> Special Order By Consent.

APA ¶ 7.16.

> renewal of that permit currently being prepared by the North Carolina Division of
> Water Quality.

APA § 3.22(k).[11] However, section 3.22(k) does not reference the POTW Wastewater Facility, and NPDES Permit No. 3395 does not concern the POTW Wastewater Facility. Rather, NPDES Permit No. 3395 concerns the operation of the Biotrol process and the discharge of effluent from the Biotrol process into the creek. Thus, the alleged defects in the POTW Wastewater Facility do not constitute a breach of Oak-Bark's representations and warranties in section 3.22(k).

Second, Hexion creates an entirely new wastewater-treatment claim in its brief in support of its motion for partial summary judgment. See Pl.'s Mem. Supp. Mot. Summ. J. 6–17; see also Pl.'s Reply 5–11. Essentially, even though Hexion's amended complaint does not mention the Biotrol process, Hexion now argues that its wastewater-treatment claim is that the Biotrol process was not available to handle the plant's sustained production operations shortly after closing; therefore, Oak-Bark breached APA section 3.22(k). See Pl.'s Mem. Supp. Mot. Summ. J. 6–17; Pl.'s Reply 5–11. In making this new argument, Hexion contends that the Biotrol process was unable to process the plant's wastewater shortly after closing, that Oak-Bark's discharge process involved illegally using the plant's boilers, and that North Carolina eliminated the option of using the Biotrol process shortly after closing. Although none of these allegations are in its amended complaint, Hexion creates an extensive new claim concerning each item and argues that Oak-Bark thereby breached APA section 3.22(k). See Pl.'s Mem. Supp. Mot. Summ. J. 6–17; Pl.'s Reply 5–11.

Oak-Bark objects to permitting Hexion to use its briefs in support of and in opposition to summary judgment to amend the wastewater-treatment claim in Hexion's amended complaint. Cf. Am. Compl. ¶¶ 10–17. Notably, a party may not use its briefs in support of or opposition to summary judgment to amend a complaint. See, e.g., Wahi v. Charleston Area Med. Ctr., Inc., 562 F.3d 599, 617 (4th Cir. 2009); Tucker v. Union of Needletrades, Indus., & Textile Employees, 407

---

[11] The reference to Permit No. 000395 is a typographical error. The parties agree that referenced permit is Permit No. 3395.

14

F.3d 784, 788 (6th Cir. 2005); Gilmour v. Gates, McDonald & Co., 382 F.3d 1312, 1315 (11th Cir. 2004) (per curiam); Shanahan v. City of Chicago, 82 F.3d 776, 781 (7th Cir. 1996); Fisher v. Metro. Life Ins. Co., 895 F.2d 1073, 1078 (5th Cir. 1990); Car Carriers, Inc. v. Ford Motor Co., 745 F.2d 1101, 1107 (7th Cir. 1984); Swann v. Source One Staffing Solutions, No. 5:09-CV-271-D, 2011 WL 761479, *10 (E.D.N.C. Feb. 24, 2011). Indeed, "a plaintiff may not raise new claims after discovery has begun without amending his complaint." Cloaninger ex rel. Estate of Cloaninger v. McDevitt, 555 F.3d 324, 336 (4th Cir. 2009).

This principle makes sense. A party's complaint puts its opponent and the court on notice of the claims in the case. If a party wishes to amend those claims, the party must follow the process set forth in the Federal Rules of Civil Procedure. Under Rule 15, provided certain time requirements are met, a party may amend a pleading once as a matter of course. See Fed. R. Civ. P. 15(a)(1). Additional amendments are allowed under Rule 15 only with the permission of the opposing party or with leave of court, and such leave should be freely given "when justice so requires." Fed. R. Civ. P. 15(a)(2). However, once a court enters a scheduling order under Rule 16, imposes a deadline concerning amendments to pleadings, and the deadline expires, the process changes. At that point, in order for a party to amend a pleading, the party must first establish "good cause" under Rule 16 and then establish the traditional requirements under Rule 15 (i.e., the absence of prejudice, futility, and bad faith). See, e.g., Nourison Rug Corp. v. Parvizian, 535 F.3d 295, 298–99 (4th Cir. 2008). If the party fails to establish "good cause" under Rule 16, a trial court may deny the motion to amend and need not conduct the inquiry under Rule 15. See id.; see also Royce v. Wyeth, No. 2:04-CV-0690, 2011 WL 1397043, at *1–2 (S.D. W. Va. Apr. 13, 2011) (unpublished); Rodgers v. Hill, No. 5:08-CT-3105-D, 2010 WL 3239104, at *13 (E.D.N.C. Aug. 16, 2010) (unpublished); Hare v. Opryland Hospitality, LLC, No. DKC 09-0599, 2010 WL 3719915, at *3 (D. Md. Sept. 17, 2010) (unpublished); Halpern v. Wake Forest Univ. Health Sci., 268 F.R.D. 264, 266 (M.D.N.C. 2010); Remediation Prods., Inc. v. Adventus Americas, Inc., No. 3:07-CV-00153-RJC DCK, 2009 WL

101692, at *1–2 (W.D.N.C. Jan. 8, 2009) (unpublished). If a party could amend its complaint via summary-judgment briefing, Rules 15 and 16 and trial court scheduling orders would be meaningless. "Given their heavy case load, district courts require the effective case management tools provided by Rule 16." Nourison Rug, 535 F.3d at 298. A trial court's scheduling order "is not a frivolous piece of paper, idly entered, which can be cavalierly disregarded by counsel without peril." Gestetner Corp. v. Case Equip. Co., 108 F.R.D. 138, 141 (D. Me. 1985).

On October 2, 2009, this court entered a scheduling order [D.E. 19]. Pursuant to that scheduling order, the court ordered that "motions to join additional parties and to amend pleadings must be made promptly after the information giving rise to the motion becomes known to the party or counsel." Id. The court also ordered that "[a]ny such motion filed after November 30, 2009, must meet the standards of Fed. R. Civ. P. 15 and 16." Id. On January 12, 2010, Hexion filed a consent motion to amend its complaint to add a citation to APA section 3.22(k) in its wastewater-treatment claim [D.E. 22], and the court granted the motion on January 19, 2010 [D.E. 23]. Hexion filed its amended complaint on January 19, 2010, and has never again sought leave to file an amended complaint.

In Cloaninger, the Fourth Circuit held that "a plaintiff may not raise new claims after discovery has begun without amending his complaint." Cloaninger, 555 F.3d at 336. In so holding, the Fourth Circuit relied in part on Barclay White Skanska, Inc. v. Battelle Memorial Institute, 262 F. App'x 556, 563 (4th Cir. 2008) (unpublished). Id. In Barclay White, the plaintiff-construction company sought to recover under a building contract and specifically referred to three disputed change orders in its amended complaint. See Barclay White, 262 F. App'x at 563. At summary judgment, the plaintiff-construction company expanded its arguments concerning the change orders to include eleven additional change orders not mentioned in its amended complaint and sought additional damages based on those eleven change orders. Id. The plaintiff-construction company argued that the heading on its complaint of "extra work" should be construed liberally as to

16

encompass all fourteen of the disputed change orders involved in the construction project, even though it had only specifically mentioned three change orders in its amended complaint. Id. at 564. The district court rejected this argument and held that the plaintiff-construction company could seek relief only for the three change orders in the amended complaint. Id. Accordingly, the district court refused to consider plaintiff's argument concerning the eleven additional change orders at summary judgment and the Fourth Circuit affirmed. Id.

The Fourth Circuit reached the same conclusion in United States ex rel. Owens v. First Kuwaiti Gen. Trading & Contracting Co., 612 F.3d 724, 731 (4th Cir. 2010). In Owens, plaintiff Owens alleged that the defendant-contractor First Kuwait had defrauded the government by billing for defective work on an embassy. Id. at 727. Owen's amended complaint described eight particular instances of defective work. Id. at 728. After discovery, First Kuwaiti sought summary judgment. Id. In response, Owens abandoned four of his claims, but added several new ones relating to the embassy's fire protection system, billing during the construction process, and First Kuwait's request for a final inspection of its work. Id. at 731. The Fourth Circuit affirmed the district court's grant of summary judgment as to the new claims, holding that Owens's failure to amend his complaint precluded him from arguing the claims at summary judgment. Id. (citing Wahi, 562 F.3d at 617). As to the billing claims specifically, Owens's new claim alleged that First Kuwaiti had overstated its construction progress in order to receive advance payments from the State Department. Id. at 732. He argued that his complaint's general allegation of First Kuwaiti's "overcharging" the government sufficiently notified First Kuwait of his subsequent claim of overstating construction progress. Id. The district court and Fourth Circuit rejected this argument, holding that the "overcharging" reference was "clearly in reference to the complaint's more specific allegations . . . ." Id. Thus, the Fourth Circuit reiterated the principle that coupling specific allegations with general language in a complaint forecloses a plaintiff's ability to use that general language to bootstrap new specific allegations and a new claim into the complaint at summary judgment. See

17

id. The Fourth Circuit also applied this principle in Wahi, when it refused to permit plaintiff to add a new defamation claim on appeal different than the defamation claim actually in plaintiff's amended complaint. See Wahi, 562 F.3d at 616–17.

Hexion's new wastewater-treatment claim is analogous to the eleven change orders not mentioned in the complaint in Barclay White, 262 F. App'x at 563, the construction progress payments not mentioned in the complaint in Owens, 612 F.3d at 732, and the new defamation claim not mentioned in the amended complaint in Wahi, 562 F.3d at 616–17. Although Hexion's new wastewater-treatment claim is associated with "wastewater treatment," the new wastewater-treatment claim is not in the amended complaint, and Hexion cannot add the claim to this case via summary-judgment briefing. See Owens, 612 F.3d at 731; Wahi, 562 F.3d at 616–17; Barclay White, 262 F. App'x at 563. To rule otherwise would neuter this court's scheduling order and make Rule 16 meaningless. See S. Grouts & Mortars, Inc. v. 3M Co., 575 F.3d 1235, 1243 (11th Cir. 2009) (holding that the district court did not abuse its discretion in refusing to allow plaintiff to amend its complaint to raise new claims when plaintiff did not seek leave to amend until after the deadline imposed by the scheduling order and after plaintiff had first tried to raise the new claims in its summary-judgment brief); Shanahan, 82 F.3d at 781 (affirming the district court's denial of leave to amend the complaint when the motion to amend was in the form of a footnote raising a new argument in a summary-judgment brief and the request was untimely, coming over a year after discovery concluded).

Alternatively, Hexion argues that even if its amended complaint did not technically contain the new wastewater-treatment claim, the court should permit Hexion to assert this new wastewater-treatment claim. In support, Hexion argues that Oak-Bark did not incur prejudice, because the parties' discovery responses allegedly show that Oak-Bark was aware of Hexion's new wastewater-

treatment claim during discovery. See Pl.'s Reply 4–11.[12] Oak-Bark denies that it was on notice of Hexion's new wastewater-treatment claim during discovery, and contends that allowing Hexion to raise its new claim would cause it prejudice. Def.'s Mem. Opp'n Mot. Summ. J. 12–13.

Having reviewed Hexion's cited documents, the court does not believe that Oak-Bark was on notice of Hexion's new wastewater-treatment claim. Indeed, the way to put a party on notice of a claim is to put the claim in the complaint or to add the claim to the amended complaint through the process set forth in Rules 15 and 16. Implicitly, Hexion is arguing that Oak-Bark waived its rights under Rules 15 and 16 by engaging in some discovery on the periphery of Hexion's possible new wastewater-treatment claim. The court rejects the notion that one party may couple the breadth of discovery under the Federal Rules of Civil Procedure with its opponent's discovery requests to de facto amend a complaint, and thereby trample a court's scheduling order or Rules 15 and 16.

In addition, the court rejects Hexion's argument that the discovery requests and responses reflect a lack of prejudice to Oak-Bark, thereby permitting Hexion's new wastewater-treatment claim to proceed. Notably, under Rule 16, if a party seeks to amend a complaint after a deadline in a scheduling order, a trial court does not focus on prejudice. Rather, if Hexion wanted to amend its complaint to raise its new wastewater-treatment claim after this court's amendment deadline of November 30, 2009, Hexion needed to seek leave of the court [D.E. 19]. See Fed. R. Civ. P. 16. If Hexion had filed such a motion, the court would have granted leave only upon Hexion's demonstrating "good cause." Fed. R. Civ. P. 16; [D.E. 19]. The "good cause" standard of Rule 16

_____

[12] In support, Hexion cites, inter alia, Oak-Bark's requests for records of Hexion's ability to use both the POTW and the Biotrol process. See id., Ex. 1 ("Oak-Bark's Discovery Requests") ¶¶ 19, 33. Hexion also cites transcripts of depositions of Oak-Bark officials, in which Hexion's attorney asked questions about Biotrol, see, e.g., id., Ex. 4 ("Pl.'s Reply Ex. 4, Barker Tr.") 15–22, 65; Def.'s Ex. 14, Oakley Tr. 51–54, 80–81, 103–09, and the transcript of the deposition of a Hexion official, in which Oak-Bark's attorney asked questions about Biotrol. See Pl.'s Reply, Ex. 7 ("Pl.'s Reply Ex. 7, Springer Tr.") 170–71. Hexion also cites its June 2010 response to an interrogatory that Oak-Bark served on Hexion in which Oak-Bark asked Hexion to explain how Oak-Bark allegedly was illegally running wastewater through the boilers on the date of closing. See Pl.'s Reply, Ex. 8 ("Hexion's Responses to Third Set of Interrogatories") ¶ 6.

does not turn on the prejudice that a tardy amendment would inflict upon the opposing party, but rather turns primarily on "the diligence of the moving party." Montgomery v. Anne Arundel County, 182 F. App'x 156, 162 (4th Cir. 2006) (per curiam) (unpublished); see United States v. 1.604 Acres of Land, No. 2:10-CV-00320, 2011 WL 1810594, at *2 (E.D. Va. May 11, 2011) (unpublished). Prejudice is relevant under Rule 15(a), and therefore considered if the good cause standard of Rule 16(b) is first met. Sansotta v. Town of Nags Head, No. 2:10-CV-29-D, 2011 WL 3438422, at *2 (E.D.N.C. Aug. 5, 2011) (unpublished). Here, Hexion never attempted to meet the good cause standard under Rule 16, and arguments in summary-judgment briefs are no substitute for a proper motion to amend in accordance with this court's scheduling order and Rule 16. Accordingly, considering prejudice to Oak-Bark or lack thereof at this stage flies squarely in the face of this court's scheduling order and Rule 16. See Nourison Rug, 535 F.3d at 299. As such, the court declines to consider Hexion's new wastewater-treatment claim.

Finally, Hexion argues that its reference to section 3.22(k) in paragraph 16 of the amended complaint provided notice of its new wastewater-treatment claim. See Pl.'s Reply 4–6; cf. Am. Compl. ¶ 16. As mentioned, section 3.22(k) states in part that "[s]ustained production operations of the facilities at their maximum design capacity will not constitute or result in any violation of . . . (NPDES) Permit No. [3395] or any renewal of that permit . . . ." APA § 3.22(k). Hexion appears to argue that by citing APA section 3.22(k), which references NPDES Permit No. 3395, it put Oak-Bark on notice that its real complaint concerned the Biotrol process. However, the amended complaint belies this assertion. See Am. Compl. ¶¶ 10–17. In the amended complaint, Hexion focuses on the "POTW Wastewater Facility," provides no factual allegation pertaining to the Biotrol process, and does not discuss how Oak-Bark's conduct involving the Biotrol process breached APA section 3.22(k). Id. Hexion's mere passing reference to APA section 3.22(k) in paragraph 16 of the amended complaint is insufficient to inform Oak-Bark of its new wastewater-treatment claim. As such, this court will not consider Hexion's new wastewater-treatment claim. See, e.g., Owens, 612

F.3d at 731; Wahi, 562 F.3d at 616–17; Cloaninger, 555 F.3d at 336; Barclay White, 262 F. App'x at 564.

In sum, no rational jury could find in favor of Hexion on the wastewater-treatment claim in Hexion's amended complaint. Am. Compl. ¶¶ 10–17. Thus, the court grants summary judgment to Oak-Bark, and denies summary judgment to Hexion.

B.

Hexion argues that Oak-Bark's failure to disclose the 2000 Fike Report breached section 3.22(g) of the APA. See Am. Compl. ¶¶ 18–21. Hexion also claims that the combustible dust at the plant created an explosion hazard that violated sections 3.17(a), 3.22(a), 3.22(c), 3.22(g), and 3.22(i) of the APA. Am. Compl. ¶ 21.[13] Hexion seeks "approximately $448,493, in order to address the explosion hazard associated with the hexamine operations and to bring the Facility into compliance with applicable legal requirements." Am. Compl. ¶ 22.

As for the 2000 Fike Report, Fike Corporation wrote the report in January 2000 for WW Sly Manufacturing Company (hereinafter "WW Sly") in connection with Wright Chemical Corporation's acquisition of Blue Tech, Inc. equipment from WW Sly for the plant. See 2000 Fike Report. As a result of the 2000 Fike Report, WW Sly modified the design of the Blue Tech, Inc. equipment for Wright Chemical Corporation to account for the explosiveness of hexamine dust, and Wright

---

[13] The court already has set forth the text of APA §§ 3.17(a), 3.22(a), 3.22(c), and 3.22(i).

APA § 3.22(g) states:

> Seller has delivered to Buyer true and complete copies and results of any reports, studies, analyses, tests, or monitoring possessed or initiated by Seller or on behalf of Seller pertaining to Hazardous Materials or Hazardous Activities in, on, or under the Facilities, or concerning compliance, by Seller or any other Person for whose conduct it is or may be held responsible, with Environmental Laws.

APA § 3.22(g).

Chemical Corporation placed the Blue Tech, Inc. equipment in the plant. See id. The Blue Tech, Inc. equipment is an excluded asset under the APA. See APA § 2.2.

The court assumes without deciding that the 2000 Fike Report falls within the APA definition of reports maintained in section 3.22(g). See APA § 3.22(g); see also APA § 1 at 7. Nonetheless, Hexion is not necessarily entitled to recover for breach of warranty. In order to recover for breach of warranty, Hexion must demonstrate that the breach was a proximate cause of its loss. See, e.g., Rose, 288 N.C. at 60, 215 S.E.2d at 577; City of Charlotte, 103 N.C. App. at 679, 407 S.E. 2d at 579. Although the 2000 Fike Report relies upon a hexamine sample that Fike Corporation analyzed in late 1999 or early 2000, the 2000 Fike Report's conclusions do not appear to be based on the unusual volatility of a specific hexamine sample from the plant. See 2000 Fike Report 4–11. Instead, the 2000 Fike Report states that the test results indicate that hexamine dust, in general, produces a dust explosion hazard. Id. at 11.[14] However, Hexion, as a hexamine producer, surely understood this basic fact. See Def.'s Mem. Supp. Mot. Summ. J., Ex. 24 ("Def.'s Ex. 24, Scott Tr.") 10–12, 15, 23, 27–28, 34, 59, 63. Furthermore, nothing in the 2000 Fike Report suggests that, in November 2006, the plant was in violation of the "general duty clause of the Occupational Safety and Health Act, 29 U.S.C. § 654, [or] requirements regarding general safety and maintenance of a clean workplace, 29 C.F.R. § 1910.22(a)(1)." Am. Comp. ¶ 20.[15] Therefore, no rational jury could find

---

[14] According to the 2000 Fike Report, the explosiveness of dust is measured in terms of the normalized rate rise of explosion pressure, signified as $K_{st}$. See 2000 Fike Report 5. A sample with a $K_{st}$ value of greater than 300 is classified as a Class 3 hazard, the most severe. Id. at 7. In the 2000 Fike Report, Fike concluded that, "A $K_{st}$ of 575 bar.m/s places Hexamethylenetetramine in a dust explosion hazard category of Class St 3." Id. at 4.

[15] 29 U.S.C. § 654 states:

Duties of employers and employees
(a) Each employer--
    (1) shall furnish to each of his employees employment and a place of employment which are free from recognized hazards that are causing or are likely to cause death or serious physical harm to his employees;
    (2) shall comply with occupational safety and health standards promulgated under

22

that Oak-Bark's failure to tender the 2000 Fike Report in conjunction with the November 2006 sale was material to the transaction or a proximate cause of the alleged losses that Hexion claims pertaining to combustible dust. See, e.g., Gardner v. Gardner, 334 N.C. 662, 665, 435 S.E.2d 324, 327 (1993) (holding that summary judgment is proper when a plaintiff fails to establish that the defendant's conduct was a foreseeable and proximate cause of the plaintiff's injury); Phillips v. Rest. Mgmt. of Carolina, Inc., 146 N.C. App. 203, 212, 552 S.E.2d 686, 692 (2001) ("If evidence is lacking as to any one of [the breach of warranty] elements, summary judgment is appropriate."); see also Sikora v. Vanderploeg, 212 S.W.3d 277, 291–92 (Tenn. Ct. App. 2006) (holding that a chiropractor's failure to specifically disclose the declining rate of new patients in conjunction with the sale of his practice did not constitute a breach of a disclosure warranty in the sale agreement when the buyer knew of the decline when he decided to purchase the practice and knew that the price of the practice reflected this decline).

As for Hexion's second combustible-dust claim, Hexion contends that the combustible dust at the plant in November 2006 created an explosion hazard and thereby violated the general duty clause of the Occupational Safety and Health Act, 29 U.S.C. § 654, and requirements regarding general safety and maintenance of a clean workplace, 29 C.F.R. § 1910.22(a)(1). In making this argument, Hexion contends that the combustible-dust hazard violated the National Fire Protection

---

this chapter.

(b) Each employee shall comply with occupational safety and health standards and all rules, regulations, and orders issued pursuant to this chapter which are applicable to his own actions and conduct.

29 C.F.R. § 1910.22(a)(1) states:

This section applies to all permanent places of employment, except where domestic, mining, or agricultural work only is performed. Measures for the control of toxic materials are considered to be outside the scope of this section.

a) Housekeeping.

(1) All places of employment, passageways, storerooms, and service rooms shall be kept clean and orderly and in a sanitary condition.

Association ("NFPA") standards on the date of closing and thereby violated APA section 3.17(a) and section 3.22(a).

As for the NFPA standards, in section 3.17(a), Oak-Bark warranted that it was in compliance "in all material respects with any applicable Occupational Safety and Health Law[s] . . . ." APA § 3.17(a)(v). In section 3.22(a) of the APA, Oak-Bark warranted that it was fully compliant with all "Environmental Laws." Id. § 3.22(a). The APA, in turn, refers to "legal requirement." See APA § 1. The APA, however, does not define "requirement." Thus, the court gives the term "requirement" its ordinary meaning. See, e.g., Harris v. Latta, 298 N.C. 555, 558, 259 S.E.2d 239, 241 (1979) ("In construing contracts ordinary words are given their ordinary meaning unless it is apparent that the words were used in a special sense."); Parker v. Glosson, 182 N.C. App. 229, 234, 641 S.E.2d 735, 738 (2007). A requirement is "a compelled obligation; a command or order." Webster's New Riverside University Dictionary 999 (2d ed. 1988). Therefore, in order for the NFPA standards to be a "legal requirement," they must be legally compelled obligations.

In support of its argument that the NFPA standards are legal requirements, Hexion contends that the NFPA standards have been incorporated into the General Duty Clause of 29 U.S.C. § 654 and 29 C.F.R. § 1910.22(a)(1). See Am. Compl. ¶ 20. However, Hexion fails to cite any regulation or precedent in support of this conclusion. In fact, Hexion admits that "as of November 30, 2006, OSHA did not have a regulation specific to combustible dust . . . ." Pl.'s Mem. Supp. Mot. Summ. J. 19. Moreover, OSHA specifically disclaims the notion that NFPA standards are legal requirements, stating, "These are NOT OSHA regulations. However, they do provide guidance from their originating organizations related to worker protection." See United States Department of Labor, OSHA, "Combustible Dust Standards," available at http://www.osha.gov/dsg/combustible dust/standards.html (last visited Sept. 28, 2011) (emphasis in original); see also Def.'s Mem. Supp. Mot. Summ. J., Ex. 26 ("Schloss Expert Report"); Def.'s Ex. 24, Scott Tr. 23; Def.'s Mem. Supp. Mot. Summ. J., Ex. 25 ("Def.'s Ex. 25, Schloss Tr.") 67–68. Accordingly, even though the NFPA

24

standards (including NFPA standard 654) are based on industry practice, they are not "environmental laws" or "occupational safety and health laws" within the meaning of section 3.17(a) or section 3.22(a) and have not been incorporated into the General Duty Clause or 29 C.F.R. § 1910.22(a)(1). Therefore, even if Hexion can show that the level of hexamine dust in the plant exceeded the NFPA standards on the date of closing, such a showing does not violate section 3.17(a) or 3.22(a). Likewise, Hexion has presented no evidence that such a showing violates APA sections 3.22(c), 3.22(g), or 3.22(i).

Alternatively, even if the NFPA standards are legal requirements, Hexion has not presented evidence from which a rational jury could find that the level of combustible dust in the plant violated 29 U.S.C. § 654, 29 C.F.R. §1910.22(a)(1), or NFPA standards on the date of closing. For example, Hexion has provided no documentation or expert testimony to suggest that the combustible dust levels were illegally high in November 2006. Although Hexion cites Hexion's own audit in March 2007, the report dealt with dust generally and focused on respiratory conditions. See Def.'s Mem. Supp. Mot. Summ. J., Ex. 32 ("2007 Audit Report"). It did not specify or find that there was a problem (legal or otherwise) with combustible dust. Id. Moreover, Hexion's report was not completed until four months after closing. See id. Furthermore, the 2000 Fike Report does not create a genuine issue of material fact given that it was completed six years before the date of closing, and made no findings that suggest that the dust in the plant was legally non-compliant. See 2000 Fike Report.

In sum, no rational jury could find in favor of Hexion on the combustible-dust claims in its amended complaint. See Am. Compl. ¶¶ 18–22. Thus, Oak-Bark's motion for summary judgment on the claims pertaining to combustible dust is granted, and Hexion's competing motion is denied.

C.

As for Hexion's ammonia storage tank claim, Oak-Bark again argues that Hexion is improperly seeking to use the summary-judgment process to amend its amended complaint. See

Def.'s Mem. Opp'n Mot. Summ. J. [D.E. 64] 13–17. In support, Oak-Bark notes that Hexion's amended complaint states that "one of the ammonia storage tanks . . . lacked mechanical integrity." Am. Compl. ¶ 23. The amended complaint then describes problems with the ammonia storage tank, id. ¶ 24, and the need for Hexion to obtain a variance as to the tank. Id. ¶ 25. Hexion then alleges that the "lack of mechanical integrity associated with the tank is also a violation of Occupational Safety and Health Administration regulations related to process safety management of highly hazardous chemicals, 29 C.F.R. § 1910.119." Id. ¶ 27. Hexion asserts that "[b]y conveying a mechanically deficient ammonia storage tank to Hexion, Oak-Bark has breached the representations and warranties contained in §§ 3.10(a), 3.10(b), 3.17(a), 3.22(a), 3.22(c), and 3.22(i) of the Agreement." Id. ¶ 28.

The evidence demonstrates that the tank referenced in the amended complaint is tank 267. See Def.'s Mem. Opp'n Mot. Summ. J., Ex. 2 ("Notice of Claims") 3–4; id., Ex. 27 ("Def.'s Opp'n Ex. 27, Swart Tr.") 107–12; id., Ex. 25 ("Def's Opp'n Ex. 25, Gaskins Tr.") 73–74; id., Ex. 22 ("May 2007 Gaskins Report") 1; id., Ex. 23 ("July 2007 Gaskins Report") 1; id., Ex. 10 ("Correspondence of Counsel") 9, 15. However, Hexion's summary-judgment briefs extensively describe alleged problems not only with tank 267, but also with tank 268 and process piping used in connection with the tanks. See Pl.'s Mem. Supp. Mot. Summ. J. 25–29; Pl.'s Reply 19. Hexion's summary-judgment briefs then create entirely new claims concerning tank 267, tank 268, and process piping. See Pl.'s Mem. Supp. Mot. Summ. J. 25–29; Pl.'s Reply 19.

Once again, the new claims in Hexion's summary-judgment briefs are like the additional change orders at issue in Barclay White, 262 F. App'x at 563, the additional overcharging claims in Owens, 612 F.3d at 732, and the additional defamation claim in Wahi, 562 F.3d at 616–17, and are not properly considered at summary judgment. If Hexion wanted its new claims concerning tank 268 and process piping to be in the case, it should have sought leave to amend the amended complaint in accordance with Rules 15 and 16 and this court's scheduling order. It did not. This

26

court will not permit Hexion to bypass Rule 15, Rule 16, or this court's scheduling order. Thus, Oak-Bark's motion for summary judgment is granted to the extent that Hexion seeks damages resulting from alleged defects in tank 268 or process piping.

As for tank 267, on May 3, 2007, Hexion received a report from Gaskins Quality Services, which identified corrosion in tank 267 and recommended repairs. See May 2007 Gaskins Report. Hexion then contracted to repair tank 267, and took tank 267 out of service during the repair work. See Def.'s Opp'n Ex. 27, Swart Tr. 123–25. However, the May 2007 Gaskins Report does not state that tank 267 lacked mechanical integrity or violated 29 C.F.R. § 1910.119.[16] See May 2007 Gaskins Report. Moreover, Gaskins testified that he never recommended to Hexion to take tank 267 out of service for a lack of mechanical integrity or fitness. See Def.'s Opp'n Ex. 25, Gaskins Tr. 71. Gaskins also testified that tank 267 was repaired and that Gaskins believed the repairs would be permanent. Id. at 73–74; see also Def.'s Mem. Opp'n Mot. Summ. J., Ex. 12 ("Brimberry Report") 6–8. Additionally, all certificates of inspection for tank 267 before the closing date and through August 2010 noted that it was fit for service, Def.'s Mem. Supp. Mot. Summ. J., Ex. 8 ("Certificate of Inspection"), and Hexion's insurance adjuster found tank 267 mechanically fit on August 5, 2009. Id., Ex. 34 ("Insurer's Report") 2. Finally, the court has reviewed APA sections 3.10(a), 3.10(b), 3.17(a), 3.22(a), 3.22(c), and 3.22(i). In light of the record, no rational jury could find that Oak-Bark breached any representations or warranties in the APA concerning tank 267. Accordingly, the court grants Oak-Bark's motion for summary judgment and denies Hexion's motion for partial summary judgment.

---

[16] 29 C.F.R. § 1910.119 "contains requirements for preventing or minimizing the consequences of catastrophic releases of toxic, reactive, flammable, or explosive chemicals. These releases may result in toxic, fire or explosion hazards."

D.

Finally, Oak-Bark seeks summary judgment based on Hexion's alleged delay in giving notice and bringing its claims. In support, Oak-Bark argues (1) that Hexion materially breached APA sections 11.3(b), 11.3(e), and 11.3(f) in failing to give timely notice of the alleged defects, thereby excusing Oak-Bark from further performance; (2) that Hexion's claims are barred by equitable estoppel and laches; and (3) that Hexion breached the implied covenant of good faith and fair dealing, thereby excusing Oak-Bark from further performance. In light of this court's disposition of Hexion's breach of warranty claims, the court need not and does not address Oak-Bark's arguments.

III.

In sum, defendant's motion for summary judgment [D.E. 51] is GRANTED as to plaintiff's breach of warranty claims. Plaintiff's motion for partial summary judgment as to liability on the warranty claims [D.E. 54] is DENIED. Defendant's motion to strike [D.E. 71] is DENIED as moot in light of this court's order of December 22, 2010 [D.E. 80], and plaintiff's motion to modify caption and pleadings to indicate a new name [D.E. 79] is DENIED. The Clerk of Court is DIRECTED to close this case.

SO ORDERED. This 28day of September 2011.

JAMES C. DEVER III
United States District Judge